## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRAVIS J. McCLURE, | : | Civil Action No. |
| Plaintiff, | : | |
| | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | |
| COUNTY OF BLAIR, | : | |
| | : | |
| BLAIR COUNTY COMMISSIONERS | : | |
| DAVID KESSLING, | : | |
| AMY WEBSTER, and | : | |
| LAURA BURKE | : | |
| | : | |
| MATTHEW HALE, WARDEN, | : | |
| in his individual and official capacity; | : | |
| | : | |
| JOHN DOE CORRECTIONS OFFICERS | : | |
| 1–10, in their individual and official | : | |
| capacities; | : | |
| | : | |
| JOHN DOE MEDICAL | : | |
| STAFF 1–5, in their individual and | : | |
| official capacities; and | : | |
| | : | |
| PRIMECARE, | : | |
| Defendants. | : | |

## COMPLAINT

### INTRODUCTION

1. Plaintiff Travis J. McClure ("Plaintiff" or "Mr. McClure"), by and through his attorneys, Levin & Zeiger, LLP, brings this civil rights action pursuant to 42 U.S.C. § 1983 against the above-named Defendants for violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution, as well as supplemental state law claims. This action arises from the failure of Blair County Commissioners and prison officials and staff to protect Mr. McClure from a violent assault by other inmates, the deliberate indifference to his serious medical needs following that assault, and the unconstitutional

policies, customs, and conditions of confinement at Blair County Prison that permitted and caused these violations to occur.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this case arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

3. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

4. Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Blair County, Pennsylvania, which is located within the Western District of Pennsylvania.

## PARTIES

5. Plaintiff Travis J. McClure is an adult individual, born on June 6, 1987. At all times relevant to this Complaint, Mr. McClure was an inmate confined at Blair County Prison, located at 423 South Juniata Street, Hollidaysburg, Blair County, Pennsylvania 16648. His address of record is 419 Market Square Alley, Hollidaysburg, Pennsylvania 16648.

6. Defendant County of Blair ("Blair County") is a municipal entity organized and existing under the laws of the Commonwealth of Pennsylvania. Blair County owns and operates the Blair County Prison and is responsible for establishing policies and procedures governing the operation of said facility, including the safety, medical care, and conditions of confinement for all inmates housed therein.

7. Defendants Blair County Commissioners David Kessling, Amy Webster, and Laura Burke ("County Commissioners") are the individuals who run the governing body

2

responsible for the oversight, management, administration, and policymaking of Blair County Prison pursuant to Pennsylvania law. The County Commissioners are responsible for establishing, implementing, and enforcing policies, procedures, customs, and practices governing the operation of the Prison, including those relating to inmate safety, staffing, medical care, and conditions of confinement.

8. Defendant Matthew Hale, Warden ("Warden"), is an individual who, at all times relevant hereto, served as the Warden of Blair County Prison. The Warden was responsible for the day-to-day operation and management of Blair County Prison, including but not limited to: inmate safety and security; staffing levels; implementation and enforcement of policies and procedures; and ensuring adequate medical care for inmates. The Warden is sued in both his individual and official capacities.

9. Defendants John Doe Corrections Officers 1–10 ("Officer Defendants") are individuals who, at all times relevant hereto, were employed as corrections officers at Blair County Prison. The Officer Defendants were on duty and responsible for the safety and security of inmates, including Plaintiff, on or about August 12, 2025, and the days immediately following. Their true identities are presently unknown to Plaintiff and will be identified through discovery. The Officer Defendants are sued in both their individual and official capacities.

10. Defendants John Doe Medical Staff 1–5 ("Medical Defendants") are individuals who, at all times relevant hereto, were employed or contracted to provide medical services at Blair County Prison. The Medical Defendants were responsible for evaluating, treating, and arranging appropriate medical care for inmates, including Plaintiff. Their true

identities are presently unknown to Plaintiff and will be identified through discovery. The Medical Defendants are sued in both their individual and official capacities.

11. Defendant PrimeCare, Inc. ("PrimeCare"), is a corporation that, upon information and belief, contracted with Blair County to provide medical and healthcare services to inmates incarcerated at Blair County Prison. At all times relevant hereto, PrimeCare was responsible for the delivery of medical care and treatment to inmates at Blair County Prison, including Plaintiff. PrimeCare acted under color of state law by performing a function traditionally and exclusively within the province of the state. PrimeCare is subject to *Monell* liability as it functioned as a municipal entity for purposes of providing constitutionally mandated healthcare to incarcerated persons. *See Natale v. Camden County Correctional Facility*, 318 F.3d 575, 583–84 (3d Cir. 2003).

12. At all times relevant to this Complaint, each of the individual Defendants was acting under color of state law within the meaning of 42 U.S.C. § 1983.

**FACTUAL ALLEGATIONS**

**A.    The Assault on Mr. McClure**

13. On or about August 12, 2025, at approximately 7:00 p.m., while incarcerated at Blair County Prison, John Doe prison guards let six inmates out of their cells with directions to attack Plaintiff.

14. Mr. McClure was violently assaulted by six individuals who punched and kicked him repeatedly in the head, face, and body.

15. The assault was of such severity that Mr. McClure sustained, inter alia: a depressed fracture of the right nasal bone with extension into the left nasal bone; a right orbital blowout fracture with orbital fat herniation of approximately 6 mm into the maxillary

sinus; possible entrapment of the inferior rectus muscle; bilateral periorbital ecchymosis; right conjunctival hemorrhage; contusion to the left side of the lower lip; a possible fracture of the left mandibular premolar; blurred vision; diplopia; and a contusion to the right lower quadrant of the abdomen.

16. The assault occurred within the confines of Blair County Prison, in an area under the supervision and control of the John Doe Corrections Officer Defendants.

17. Upon information and belief, the John Doe Corrections Officer Defendants knew or should have known of the substantial risk of serious harm to Mr. McClure from other inmates, including but not limited to threats, prior incidents of violence, and the known dangerous conditions at the Prison, and failed to take reasonable measures to protect him.

18. Upon information and belief, the Officer Defendants failed to adequately monitor, supervise, or intervene to prevent the assault on Mr. McClure, despite having the duty and opportunity to do so.

**B.    Deliberate Indifference to Serious Medical Needs**

19. Following the assault on August 12, 2025, Mr. McClure suffered from severe pain in his head, face, and eyes, including headache, right eye pain, decreased vision, blurred vision, diplopia, nausea, and vomiting. These symptoms were indicative of serious traumatic injuries requiring immediate medical evaluation and treatment.

20. Despite the obvious severity of Mr. McClure's injuries including visible periorbital swelling, bruising, and ecchymosis to both eyes. The John Doe Medical Defendants failed to provide Mr. McClure with any meaningful medical evaluation or treatment, and failed to arrange for his transfer to an emergency medical facility, for approximately two days following the assault.

21. Mr. McClure was not transported to the UPMC Altoona Emergency Department until August 14, 2025, at approximately 11:39 a.m., a delay of approximately forty (40) hours after the assault occurred.

22. During the approximately two-day period between the assault and his arrival at the hospital, Mr. McClure was forced to endure excruciating pain and suffering from multiple facial fractures, including a right orbital blowout fracture, without adequate medical attention, pain management, or diagnostic evaluation.

23. The Medical Defendants and the Correction Officer Defendants knew or should have known that Mr. McClure had been assaulted and was experiencing symptoms consistent with serious traumatic injuries, yet they failed to arrange for timely medical evaluation and care.

24. Upon his presentation to UPMC Altoona on August 14, 2025, Dr. Adam Blescia and PA-C Amy Matkins Gardner documented that Mr. McClure was a 38-year-old male prisoner seen as an emergency department consult after being assaulted and kicked and punched in the head and face two days prior. CT imaging confirmed nasal bone fractures and a right orbital blowout fracture with an approximate 7 mm × 8 mm defect and 6 mm fat herniation, with possible entrapment of the inferior rectus muscle.

25. The injuries sustained by Mr. McClure were so serious that the trauma service at UPMC Altoona determined that the facility lacked the ophthalmology capabilities necessary to treat his orbital injuries and recommended transfer to a quaternary medical center. Mr. McClure was accepted for transfer to UPMC Presbyterian as a Level 2 trauma.

26. On August 15, 2025, Mr. McClure was transferred to UPMC Presbyterian in Pittsburgh, where he was triaged at the highest acuity level (Level 5) and received a Level II Trauma

Response. He underwent extensive diagnostic imaging (including bilateral X-rays of the elbows, forearms, and wrists, as well as a chest X-ray), comprehensive laboratory evaluation, an EKG, and was administered IV hydromorphone (Dilaudid) for pain management. Ophthalmology and oral maxillofacial surgery consults were ordered.

27. The two-day delay in providing medical care to Mr. McClure caused him to suffer unnecessary and prolonged pain and suffering, and may have exacerbated his injuries, including the risk of permanent damage to his right eye and vision.

**C.    Historic Dangerous Conditions at Blair County Prison**

28. Blair County Prison (hereinafter "the Prison" or "BCP") is a county correctional facility located at 423 Mulberry Street, Hollidaysburg, Pennsylvania 16648. The Prison is owned and operated by the County of Blair, a municipality and political subdivision of the Commonwealth of Pennsylvania. Blair County, through its Board of Commissioners, is responsible for the funding, administration, staffing, maintenance, and oversight of the Prison.

29. The original Blair County Prison was designed by architect Edward Haviland and constructed between 1868 and 1869. The facility was built in a Gothic Revival castellated style, modeled as a condensed version of Eastern State Penitentiary in Philadelphia. The original structure features a three-story central watch tower above the entrance, flanked by two-story polygonal bays. The Prison has undergone expansions and renovations, including additions constructed in 1983, 1990, and 2004. Despite these modifications, the core of the facility remains the structure built over 155 years ago.

30. The Prison's rated capacity is approximately 337 inmates, with Blair County officials stating the ideal population should be between 370 and 390 inmates. However, the inmate

population has routinely exceeded these figures, at times surpassing 400 inmates, resulting in inmates being housed in areas not designed for habitation, including the prison gymnasium.

31. Blair County has long been aware of the deteriorating physical conditions at the Prison. In or around July 2024, it was publicly reported that the facility was dealing with an abundance of rodents, as well as air conditioning and plumbing malfunctions. The building has been described by its own officials as "crumbling." The facility suffers from severe and persistent environmental hazards including asbestos contamination, black mold, lead paint, and a pervasive mouse infestation.

32. In or around September 2024, the Blair County Chapter of the NAACP joined the Pennsylvania Prison Society in conducting the first full civil rights audit of the Blair County Prison. According to Andrae Holsey, President of the Blair County NAACP, every single checkpoint in the audit was failed. Officials from the Pennsylvania Prison Society characterized the inspection as one of the worst they had seen in twenty-five years. Blair County Commissioners have publicly acknowledged that the Prison is in "dire straits."

33. Numerous inmates have filed lawsuits alleging that they suffered harm due to the horrific conditions and failure to provide medical care at Blair County Prison, including the following cases:

34. *Aughenbaugh v. Blair County, et al.*, No. 3:09-cv-00159-KRG (W.D. Pa.). In 2007, inmate Nathan Aughenbaugh died by suicide while incarcerated at Blair County Prison. The Estate of Aughenbaugh filed a wrongful death action in 2009, naming Blair County, prison officials, and the decedent's personal physician as defendants. The case resulted in

a settlement of $350,000, reflecting the County's acknowledged exposure for its failure to prevent the suicide of an inmate in its custody.

35.   ***Beckwith v. Blair County, et al.***, No. 3:18-cv-00040 (W.D. Pa.). On October 24, 2016, twenty-three-year-old inmate Samantha Rea Beckwith was found dead in her cell at Blair County Prison. Her death was ruled a suicide. Beckwith had bipolar disorder, took daily medication, and had been incarcerated at the Prison on ten prior occasions over a four-year period, during which the Prison had prepared twenty reports concerning her medical and mental health issues. Her grandmother, Deborah Beckwith, filed suit against Blair County, the Blair County Prison, former Warden Michael Johnston, former Deputy Warden Randy Pollock, and PrimeCare Medical, Inc. The Court found sufficient evidence that the County maintained a deficient policy that permitted corrections officers to remove detainees from suicide watch without a mental health evaluation and failed to provide clear communication protocols between corrections officers and medical staff. After the court denied summary judgment, the parties settled the case for an undisclosed amount.

36.   ***Brown v. Blair County Prison, et al.***, No. 3:23-cv-00126 (W.D. Pa.). On August 8, 2024, an inmate weighing approximately 120 pounds was attacked by other inmates at Blair County Prison, knocked unconscious, and suffered multiple facial injuries including fractures of the nose and around his eyes. The victim required multiple surgeries, including metallic implants and cosmetic procedures, to repair the damage. A federal civil rights lawsuit was filed naming Blair County, a former warden, and three corrections officers as defendants. The plaintiff's attorney described the incident as resulting from a "horrible failure in policy and procedure by those running the jail."

37. *Meyer v. Blair County Prison Officials, et al.*, No. 3:25-cv-00328 (W.D. Pa.). On or about October 1, 2025, inmate Donald Earl Meyer filed a class action petition in the United States District Court for the Western District of Pennsylvania on behalf of all inmates at Blair County Prison. The petition characterizes conditions at the Prison as "cruel and unusual punishment" in violation of the Eighth Amendment. Meyer's complaint alleges: black mold throughout the facility and in areas used during prisoner transport; food portions insufficient for adult nutrition and suitable only for a child; mice feces found on food trays on multiple occasions, causing inmates to become ill; that Meyer himself was bitten by a mouse while sleeping; and that inmates are being prevented from attending court hearings and making legal calls. The class seeks $20 million in damages and a full investigation into Blair County Prison. The case has been referred to Magistrate Judge Keith A. Pesto in Johnstown. Additional inmates subsequently filed federal petitions seeking to join the class action.

38. *Watts v. Blair County, Pennsylvania, et al.*, No. 3:26-cv-00479 (W.D. Pa.). Two women filed suit against Blair County after an incident on September 22, 2023, during which they entered the Prison lobby for the visitor screening process and were subjected to allegedly unconstitutional search procedures. The complaint asserts claims under the Fourth and Fourteenth Amendments to the United States Constitution, including two counts of unreasonable search and seizure, two violations of the Equal Protection Clause, and two *Monell* violations. The *Monell* counts charge the County with failure to properly train its employees concerning adequate visitor search policies. The plaintiff seeks in excess of $50,000 in damages on each of six counts.

10

39.   *Evans v. Blair County Prison*, No. 3:26-cv-00338 (W.D. Pa.). On or about March 2, 2026, inmate Willie Lee Evans Jr. filed a civil rights complaint alleging violations of the Eighth Amendment. Evans alleges he has been housed in the prison gymnasium with approximately forty-nine other inmates since early December 2025, with only one bathroom and one shower available. He alleges the area contains mold and lacks adequate outdoor access. Evans states he has suffered breathing and heart-related issues as a result of exposure to mold in the gym. He seeks $100 million in damages.

40.   *Walker v. Blair County Prison*, No. 3:26-cv-00384 (W.D. Pa.). On or about March 6, 2026, inmate Joseph Walker filed a civil rights complaint alleging violations of the Eighth Amendment. Walker alleges he was placed in a holding cell for more than twenty-four hours with three other inmates and no beds, forcing him to sleep on the floor. He was subsequently housed in the prison gymnasium with more than thirty-seven inmates, again sleeping on the floor and sharing a single shower and bathroom. Walker further alleges inmates were required to sleep with lights on twenty-four hours a day, and that the facility was unsanitary, describing mice running across the floor and over inmates while they slept. Walker states the alleged conditions began around September 2025 and have continued through the present.

41.   *Horner v. PrimeCare Medical, et al.*, No. 3:25-cv-526 (W.D. Pa.). Inmate Amanda Marie Horner, age 42, filed a federal civil rights complaint alleging that jail officials and PrimeCare Medical, Inc., the Prison's contracted healthcare provider, failed to provide adequate care during her high-risk pregnancy. Horner was incarcerated at the Prison beginning on or about April 3, 2025, and alleges she informed medical staff upon arrival that she was pregnant and at high risk due to prior complications. She alleges she

repeatedly reported bleeding, cramping, and pain over several weeks, but her requests for medical care were delayed or ignored despite multiple sick call requests and grievances. On or about April 16, 2025, Horner was taken to UPMC Altoona, where she was informed she was having a miscarriage. After being returned to the Prison, she experienced a second miscarriage in the shower. Horner was subsequently moved to another cell and told to sleep on the floor due to overcrowding. She seeks $1 million in damages and injunctive relief, including proper healthcare, hygiene supplies for female inmates, adequate square footage per inmate, and recreation time for all inmates.

42.    On or about January 2026, inmate April Stamps, age fifty-five, was found dead in her cell at Blair County Prison. The Blair County Coroner determined her death was caused by a combination of drugs and medical conditions. This death occurred amid the ongoing wave of federal litigation concerning conditions at the Prison.

43.    The foregoing cases, spanning from 2007 to the present, demonstrate a persistent and well-settled pattern, practice, and custom of constitutional violations at Blair County Prison. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may be held liable under 42 U.S.C. § 1983 when the execution of a government's policy or custom inflicts the injury at issue. The pattern of litigation against Blair County establishes that the County's policymakers have been on notice for nearly two decades that the Prison's policies, customs, and practices cause constitutional harm to inmates and visitors.

44.    The County's deliberate indifference is evidenced by its repeated failures including, but not limited to: (a) failure to maintain a facility free from environmental hazards, including asbestos, black mold, lead paint, and rodent infestation; (b) failure to prevent

12

chronic and dangerous overcrowding, including housing inmates in gymnasiums and holding cells without adequate sanitation, bedding, or ventilation; (c) failure to provide adequate medical care, as evidenced by the Horner miscarriage case and the death of April Stamps; (d) failure to provide adequate mental health care and suicide prevention protocols, as established by the court's findings in the Beckwith litigation and the Aughenbaugh settlement; (e) failure to adequately staff the Prison, resulting in all-day lockups and inability to ensure inmate safety, as demonstrated by the Brown assault case; (f) failure to provide adequate nutrition and sanitary food service; (g) failure to train and supervise employees, as charged in the Watts *Monell* claims regarding visitor search policies; and (h) failure to implement policies to protect inmates from known risks of harm.

45.   Despite the accumulation of lawsuits, settlements, judicial findings, and public reports, including the failed 2024 NAACP/Pennsylvania Prison Society civil rights audit in which every checkpoint failed, Blair County has not taken adequate corrective action. The County did not initiate a feasibility study for a replacement facility until 2022, and a new prison is not projected to be completed until approximately July 2028. These facts establish that the County's failures constitute official policy or custom within the meaning of *Monell*, and that the County's deliberate indifference was the moving force behind the constitutional violations suffered by Plaintiff(s).

### CAUSES OF ACTION

### COUNT I
**Failure to Protect — Eighth Amendment**
**42 U.S.C. § 1983 — Against Officer Defendants and Warden Doe**

46.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

13

47. At all times relevant to this Complaint, Mr. McClure was a convicted prisoner housed at Blair County Prison and was entitled to the protections of the Eighth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment.

48. Under the Eighth Amendment, prison officials have a duty to protect inmates from violence at the hands of other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

49. The Officer Defendants and the Warden knew of and disregarded an excessive risk to Mr. McClure's health and safety. They were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, including the documented history of inmate-on-inmate violence, overcrowding, and inadequate staffing at Blair County Prison; they drew that inference, yet failed to take reasonable measures to abate the risk.

50. The failure of the Officer Defendants to adequately monitor, supervise, and protect Mr. McClure from the violent assault on August 12, 2025, constituted deliberate indifference to a substantial risk of serious harm in violation of Mr. McClure's Eighth Amendment rights.

51. As a direct and proximate result of the Defendants' deliberate indifference, Mr. McClure was violently assaulted and suffered serious physical injuries, including nasal bone fractures, a right orbital blowout fracture, and related injuries, as well as severe pain and suffering, emotional distress, and mental anguish.

**COUNT II**
**Deliberate Indifference to Serious Medical Needs — Eighth Amendment**
**42 U.S.C. § 1983 — Against Officer Defendants, Medical Defendants, and the Warden**

52. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

53. The Eighth Amendment, as applied through the Fourteenth Amendment, prohibits deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

14

54. Mr. McClure had an objectively serious medical need following the assault on August 12, 2025. He had sustained multiple facial fractures, including a right orbital blowout fracture with fat herniation and possible muscle entrapment, that were later confirmed by CT imaging and that ultimately required evaluation at two hospitals, a Level II Trauma Response, the highest acuity triage level, and specialist consultations in ophthalmology and oral maxillofacial surgery.

55. The Officer Defendants and Medical Defendants knew or should have known of Mr. McClure's serious medical needs based on the obvious nature of his injuries, including visible facial swelling, bruising, ecchymosis, and his complaints of severe pain, decreased vision, and other symptoms.

56. Despite this knowledge, the Defendants failed to provide Mr. McClure with timely medical evaluation or treatment, and failed to arrange for his transfer to an appropriate medical facility for approximately two (2) days, from August 12 to August 14, 2025.

57. The approximately forty-hour delay in providing medical care for multiple facial fractures and an orbital blowout fracture with possible muscle entrapment constituted deliberate indifference to Mr. McClure's serious medical needs in violation of his Eighth Amendment rights.

58. As a direct and proximate result of this deliberate indifference, Mr. McClure endured approximately two days of unnecessary and excruciating pain and suffering from untreated facial fractures and a compromised right orbital floor, and was exposed to the risk of permanent injury to his eye, vision, and other functions.

### COUNT III
### Municipal Liability — *Monell* Claim
### 42 U.S.C. § 1983 — Against Blair County and Blair County Commissioner and PrimeCare

59. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

15

60.    Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may be held liable under 42 U.S.C. § 1983 when the execution of its official policy or custom inflicts injury, or when the constitutional violation is caused by a failure to train, supervise, or discipline employees that amounts to deliberate indifference to the rights of persons with whom those employees come into contact.

61.    Blair County and the Blair County Prison Board, as the entities responsible for the operation, management, and policymaking of Blair County Prison, maintained and tolerated unconstitutional policies, customs, and practices that were the moving force behind the constitutional violations suffered by Mr. McClure, including but not limited to:

    (a)    A policy, custom, or practice of chronic understaffing of corrections officers, resulting in inadequate supervision and monitoring of inmates, and creating conditions in which inmate-on-inmate violence was foreseeable and likely to occur;

    (b)    A policy, custom, or practice of overcrowding the facility beyond its safe and intended capacity, including housing dozens of inmates in a gymnasium with inadequate sanitation facilities, thereby increasing tensions, reducing the ability of staff to maintain safety, and creating conditions conducive to violence;

    (c)    A policy, custom, or practice of failing to adequately classify, separate, and monitor inmates who posed a known risk of violence to other inmates;

    (d)    A policy, custom, or practice of deliberate indifference to inmate safety, including officers turning a blind eye to violence, failing to conduct adequate security rounds, and failing to intervene to prevent assaults;

16

(e)     A policy, custom, or practice of failing to provide timely medical evaluation and care to inmates who have been injured or who report symptoms of serious medical conditions, including a failure to arrange for timely transport to hospital emergency departments;

(f)     A policy, custom, or practice of failing to adequately train, supervise, and discipline corrections officers and medical staff regarding their obligations under the Eighth Amendment with respect to inmate safety and medical care;

(g)     A policy, custom, or practice of maintaining the prison facility in a dangerous, unsanitary, and structurally deficient condition that is unfit for the housing of inmates, as evidenced by the presence of black mold, rodent infestations, inadequate ventilation, and fire code violations; and

(h)     A policy, custom, or practice of failing to investigate and remediate incidents of inmate-on-inmate violence and the underlying conditions that contribute to such violence.

62.    The municipal Defendants had actual and constructive knowledge of the foregoing dangerous conditions, policies, customs, and practices through, inter alia: the numerous prior civil rights complaints and lawsuits filed by inmates of Blair County Prison in federal court; public reports and complaints regarding conditions at the Prison; the staffing shortages acknowledged by the Blair County Commissioners; lack of adequate medical care; and the decision to plan construction of a new prison facility.

63.    Despite this knowledge, Blair County, the County Commissioners, and PrimeCare failed to take adequate corrective action, and their deliberate indifference to the known

17

dangerous conditions was the moving force behind the constitutional violations suffered by Mr. McClure.

64. As a direct and proximate result of the unconstitutional policies, customs, and practices of Blair County and the Prison Board, Mr. McClure was subjected to a violent assault and was denied timely medical care, causing him to suffer serious physical injuries, severe pain and suffering, emotional distress, and mental anguish.

**COUNT IV**
**Supervisory Liability — Eighth and Fourteenth Amendments**
**42 U.S.C. § 1983 — Against Blair County Commissioners Kessling, Webster, and Burke, and Warden Hale, in Their Individual Capacities**

65. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

66. Defendants David Kessling, Amy Webster, and Laura Burke ("Commissioner Defendants"), as the Blair County Board of Commissioners, are the final policymaking authority for Blair County with respect to the operation, management, funding, and oversight of Blair County Prison. The Commissioner Defendants sit as members of the Blair County Prison Board and are directly responsible for establishing and enforcing policies governing inmate safety, staffing levels, facility maintenance, medical care, and conditions of confinement.

67. The Commissioner Defendants personally participated in decisions and policy choices that directly caused or contributed to the constitutional violations suffered by Mr. McClure, including but not limited to:

   (a) Staffing Decisions: The Commissioner Defendants personally approved the resignations of corrections officers at Blair County Prison, including those approved during regularly scheduled business sessions, with actual knowledge that each departure worsened an already critical staffing shortage. Despite

18

knowing that the Prison had at least seventeen (17) vacant corrections officer positions out of a complement of seventy-eight (78), the Commissioner Defendants failed to authorize the funding, recruitment, or retention incentives necessary to maintain constitutionally adequate staffing levels. This chronic understaffing directly contributed to the inadequate supervision that permitted the six-inmate assault on Mr. McClure on August 12, 2025.

(b) Overcrowding Decisions: The Commissioner Defendants had direct knowledge that the Prison's inmate population routinely exceeded its rated capacity of approximately 337 inmates, at times reaching 384 or more inmates with only 355 available beds. Despite this knowledge, the Commissioner Defendants continued to authorize the housing of inmates in the prison gymnasium and other areas not designed for habitation, and failed to take steps to reduce the inmate population or expand capacity to constitutionally adequate levels. The overcrowded conditions increased tensions among inmates, overwhelmed the already insufficient staff, and created the environment in which Mr. McClure was attacked.

(c) Budget and Resource Allocation: The Commissioner Defendants exercised direct control over the Prison's operating budget. By the first half of 2024, the Prison had expended sixty-four percent (64%) of its annual operating budget, a substantial portion of which was attributable to emergency maintenance and repairs on the aging facility. The Commissioner Defendants made the deliberate choice to continue operating the 1869 facility with inadequate funding rather than allocating the resources necessary to ensure constitutionally adequate conditions

of confinement, including adequate staffing, functional security systems, and safe housing for inmates.

(d) Knowledge from Prior Litigation and Complaints: The Commissioner Defendants had actual knowledge of the dangerous conditions at the Prison through their direct involvement in responding to the numerous federal civil rights lawsuits filed against Blair County, including the class action filed in *Meyer v. Blair County Prison Officials*, No. 3:25-cv-00328 (W.D. Pa.), as well as the multiple individual inmate complaints documenting overcrowding, violence, rodent infestation, mold, and inadequate medical care. Defendant Kessling publicly acknowledged that he "wasn't surprised" by the resignation of Warden Abbie Tate in June 2025, in light of the "ongoing issues at the prison." The Commissioner Defendants' knowledge of these pervasive and recurring constitutional violations, combined with their failure to take corrective action, constitutes acquiescence in the ongoing violations.

(e) Knowledge from the NAACP/Pennsylvania Prison Society Civil Rights Audit: In or about September 2024, the Blair County Chapter of the NAACP and the Pennsylvania Prison Society conducted the first full civil rights audit of Blair County Prison. Every single checkpoint was failed, and Pennsylvania Prison Society officials described it as one of the worst inspections they had seen in twenty-five years. The Commissioner Defendants were made aware of these findings and publicly acknowledged that the Prison was in "dire straits," yet failed to implement meaningful corrective measures to address the identified constitutional deficiencies prior to the assault on Mr. McClure in August 2025.

20

(f) Deliberate Delay in Constructing Replacement Facility: The Commissioner Defendants did not initiate a feasibility study for a replacement prison until 2022, despite decades of documented deterioration. Even after the study recommended constructing an entirely new facility rather than refurbishing the existing Prison, the Commissioner Defendants did not begin land acquisition until 2025 or 2026, and construction of the new facility is not projected to be completed until approximately July 2028. The Commissioner Defendants' decision to continue housing inmates in a facility they knew was dangerous, structurally deficient, and constitutionally inadequate, while delaying replacement for years, demonstrates deliberate indifference to the known risks.

(g) Failure to Implement Corrective Policies After Warden Turnover: When Warden Abbie Tate resigned effective immediately in June 2025, the Commissioner Defendants appointed Deputy Warden Shaun Edmundson as acting warden and subsequently hired Defendant Matthew Hale, effective October 6, 2025. Despite the leadership transition occurring against the backdrop of mounting lawsuits, the failed civil rights audit, and publicly acknowledged "ongoing issues," the Commissioner Defendants failed to implement new policies, procedures, or directives to address the known pattern of inmate-on-inmate violence, inadequate medical care, or dangerous conditions at the facility. The assault on Mr. McClure occurred on August 12, 2025, during a period in which the Commissioner Defendants were on notice of all of the foregoing risks.

68.    Defendant Matthew Hale ("Warden Hale") became the Warden of Blair County Prison effective October 6, 2025. However, the allegations herein establish Warden Hale's

21

personal involvement in the ongoing constitutional violations suffered by Mr. McClure, which continued after the assault and through the present.

69.    Warden Hale's personal involvement in the constitutional violations includes, but is not limited to:

(a) Assumed Responsibility for Known Dangerous Conditions: Warden Hale accepted the position of Warden with actual knowledge of the conditions at Blair County Prison, including the overcrowding, understaffing, failed civil rights audit, mounting federal lawsuits, environmental hazards, and documented pattern of violence. By accepting and exercising the authority of Warden, Hale assumed personal responsibility for the day-to-day management of the facility and for implementing policies to address these known constitutional deficiencies.

(b) Failure to Correct Conditions Contributing to Inadequate Medical Care: Upon assuming his role, Warden Hale was personally responsible for overseeing and ensuring the delivery of adequate medical care to inmates, including monitoring the performance of PrimeCare Medical, Inc., the Prison's contracted healthcare provider. Despite knowledge of the documented pattern of inadequate medical care at the facility, including the *Horner* miscarriage case, the death of inmate April Stamps in January 2026, and the approximately forty-hour delay in providing medical treatment to Mr. McClure, Warden Hale failed to implement corrective policies or procedures to ensure timely medical evaluation and emergency transfer of seriously injured inmates.

(c) Continued Housing of Inmates in Unconstitutional Conditions: Under Warden Hale's direct supervision, inmates continued to be housed in the prison

gymnasium with as many as forty-nine (49) inmates sharing a single toilet, sink, and shower. Warden Hale personally directed or acquiesced in the continued use of the gymnasium and other non-residential areas for housing inmates, despite knowing that such overcrowded and unsanitary conditions violated the Eighth Amendment and created an unreasonable risk of harm, including violence, disease, and mental health deterioration.

(d) Staffing and Security Decisions: As Warden, Hale was directly responsible for establishing security protocols, assigning corrections officers, setting schedules for inmate monitoring and rounds, and implementing classification procedures to separate inmates who posed a known risk of violence. Warden Hale failed to establish or enforce adequate security protocols to prevent inmate-on-inmate assaults, failed to ensure sufficient corrections officers were on duty to monitor and protect inmates, and failed to implement adequate inmate classification procedures that would have prevented the assault on Mr. McClure.

(e) Knowledge and Acquiescence in Ongoing Violations: Since assuming his position, Warden Hale has had direct and personal knowledge of the continuing pattern of constitutional violations at Blair County Prison, including through the ongoing federal litigation, the conditions he personally observed and oversaw, and the complaints and grievances of inmates. When asked to comment on the ongoing lawsuits against the Prison, Warden Hale stated he could not comment on pending litigation, but at no time has Warden Hale implemented meaningful reforms to address the pattern of violence, inadequate medical care,

23

overcrowding, or environmental hazards. His knowledge, combined with his failure to act, constitutes acquiescence in the ongoing constitutional violations.

70. The personal involvement of the Commissioner Defendants and Warden Hale in the policies, decisions, and failures described above was a direct and proximate cause of the constitutional injuries suffered by Mr. McClure. Specifically:

   (a) The Commissioner Defendants' decisions regarding staffing, overcrowding, budget allocation, and their failure to implement corrective measures despite actual knowledge of the dangerous conditions at the Prison, created and perpetuated the environment in which Mr. McClure was violently assaulted by six inmates on August 12, 2025;

   (b) The Commissioner Defendants' failure to oversee and ensure adequate medical care at the Prison, and their continued retention of PrimeCare despite knowledge of its deficient performance, directly contributed to the approximately forty-hour delay in providing Mr. McClure with medical treatment for multiple facial fractures and a right orbital blowout fracture;

   (c) Warden Hale's failure to implement adequate security protocols, inmate classification procedures, and staffing assignments perpetuated the conditions under which violent assaults occurred with regularity at the Prison; and

   (d) Warden Hale's failure to establish and enforce protocols for the emergent medical evaluation and transfer of seriously injured inmates contributed to the pattern of delayed and inadequate medical care that resulted in Mr. McClure's prolonged and unnecessary suffering.

71. As a direct and proximate result of the supervisory Defendants' personal involvement in the constitutional violations described herein, Mr. McClure suffered serious physical injuries, severe and prolonged pain and suffering, emotional distress, mental anguish, and the risk of permanent injury to his right eye and vision, as more fully described in the preceding paragraphs of this Complaint.

72. The conduct of the Commissioner Defendants and Warden Hale as described herein was undertaken with deliberate indifference to, and reckless disregard for, the constitutional rights, health, and safety of Mr. McClure and other inmates at Blair County Prison. The supervisory Defendants' knowledge of the pervasive and well-documented dangerous conditions, combined with their conscious decision to continue operating the Prison under those conditions without implementing meaningful reforms, demonstrates the type of callous indifference to constitutional rights that warrants the imposition of punitive damages against each supervisory Defendant in his or her individual capacity.

**COUNT V**
**Medical Malpractice — Professional Negligence**
**Pennsylvania State Law — Against Medical Defendants and PrimeCare**

73. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

74. At all times relevant hereto, the Medical Defendants, identified as John Doe Medical Staff 1–5, were healthcare providers within the meaning of 40 P.S. § 1303.103, who were licensed, certified, or otherwise authorized to provide medical care and treatment to inmates at Blair County Prison. The Medical Defendants owed a duty of care to Plaintiff as their patient pursuant to the physician-patient relationship established when Plaintiff was presented to them for evaluation and treatment following the assault of August 12, 2025.

25

75.    Defendant PrimeCare Medical, Inc. ("PrimeCare"), as the corporate entity that contracted with Blair County to provide medical and healthcare services to inmates at Blair County Prison, owed an independent duty of care to Plaintiff. PrimeCare is liable for the negligent acts and omissions of its employees and agents under the doctrine of respondeat superior, and is further subject to direct liability under the corporate negligence doctrine.

76.    The applicable standard of care required the Medical Defendants, upon learning that Plaintiff had been violently assaulted by six inmates and had sustained blunt force trauma to the head, face, and eyes, to promptly and thoroughly evaluate Plaintiff's injuries, including but not limited to: performing a complete physical examination; assessing for signs of facial fractures, orbital injury, and intracranial injury; ordering appropriate diagnostic imaging; providing adequate pain management; and arranging for emergent transfer to a hospital emergency department equipped to evaluate and treat traumatic facial and orbital injuries.

77.    The standard of care further required that the Medical Defendants recognize and respond to the following clinical indicators of serious traumatic injury that were present and observable upon even a cursory examination of Plaintiff following the assault:

(a) Bilateral periorbital ecchymosis (raccoon eyes), a recognized clinical sign of facial fractures and potential basilar skull fracture;

(b) Right conjunctival hemorrhage, indicative of significant blunt force trauma to the orbital region;

(c) Visible facial swelling and bruising consistent with multiple blunt force impacts;

(d) Plaintiff's complaints of severe pain in the head, face, and eyes;

(e) Decreased and blurred vision in the right eye, indicative of possible orbital fracture with muscle entrapment or retrobulbar hematoma;

(f) Diplopia (double vision), a hallmark symptom of orbital blowout fracture with inferior rectus muscle involvement; and

(g) Nausea and vomiting, which in the context of head trauma may indicate elevated intracranial pressure or concussive injury.

78. The Medical Defendants breached the applicable standard of care by failing to provide Plaintiff with any meaningful medical evaluation or treatment for approximately forty (40) hours following the assault, from the evening of August 12, 2025, until approximately 11:39 a.m. on August 14, 2025, when Plaintiff was finally transported to the UPMC Altoona Emergency Department.

79. The Medical Defendants' specific breaches of the standard of care include, but are not limited to:

(a) Failing to perform a timely and adequate physical examination of Plaintiff following the assault;

(b) Failing to recognize the clinical significance of Plaintiff's presenting signs and symptoms, including bilateral periorbital ecchymosis, conjunctival hemorrhage, decreased vision, diplopia, and severe facial pain;

(c) Failing to order or obtain appropriate diagnostic imaging, including CT scanning of the face and orbits, on an emergent basis;

(d) Failing to arrange for Plaintiff's emergent transfer to a hospital emergency department for evaluation and treatment of suspected facial and orbital fractures;

27

(e) Failing to provide adequate pain management to Plaintiff, who was forced to endure excruciating pain from multiple untreated facial fractures for approximately two days;

(f) Failing to consult with or refer Plaintiff to appropriate specialists, including ophthalmology and oral maxillofacial surgery, on a timely basis;

(g) Failing to monitor Plaintiff's condition for signs of deterioration, including worsening vision loss, which could indicate progressive orbital compartment syndrome or retrobulbar hematoma requiring emergent surgical intervention; and

(h) Failing to document, assess, and act upon Plaintiff's repeated complaints of pain, visual changes, and other symptoms during the approximately forty-hour delay.

80.    As a direct and proximate result of the Medical Defendants' breaches of the standard of care, Plaintiff suffered the following injuries and damages:

(a) Approximately forty (40) hours of unnecessary, severe, and excruciating pain and suffering from untreated nasal bone fractures (bilateral) and a right orbital blowout fracture with fat herniation and possible inferior rectus muscle entrapment;

(b) Prolonged and unnecessary exposure to the risk of permanent damage to the right eye, including the risk of ischemic injury to the inferior rectus muscle from entrapment, retrobulbar hematoma, orbital compartment syndrome, and permanent visual impairment;

(c) Exacerbation of Plaintiff's injuries due to the delay in obtaining appropriate diagnostic evaluation and treatment;

28

(d) The need for evaluation at two separate hospital facilities, UPMC Altoona and UPMC Presbyterian, including a Level II Trauma Response and the highest acuity triage level (Level 5) at UPMC Presbyterian, specialist consultations in ophthalmology and oral maxillofacial surgery, extensive diagnostic imaging, laboratory evaluation, and IV narcotic pain medication;

(e) Severe emotional distress, mental anguish, fear, and anxiety caused by the experience of being left to suffer from serious traumatic injuries without medical attention while incarcerated; and

(f) Past, present, and future medical expenses arising from the delayed treatment and any additional treatment necessitated by the delay.

81. PrimeCare is independently liable under the corporate negligence doctrine recognized in Pennsylvania. PrimeCare's duties as the corporate provider of healthcare services at Blair County Prison included:

(a) A duty to employ and retain competent medical personnel and to ensure that its employees and agents possessed the training, qualifications, and resources necessary to provide constitutionally and professionally adequate medical care to inmates;

(b) A duty to establish, implement, and enforce adequate policies, protocols, and procedures for the timely evaluation, treatment, and emergency transfer of inmates presenting with signs and symptoms of serious traumatic injury;

(c) A duty to oversee and supervise the medical care rendered by its employees and agents at Blair County Prison; and

(d) A duty to ensure that adequate medical equipment, supplies, and staffing were available at the Prison to respond to medical emergencies, including traumatic injuries resulting from inmate assaults.

82. PrimeCare breached these corporate duties by failing to establish and enforce adequate protocols for the emergent evaluation and transfer of inmates with serious traumatic injuries; by failing to adequately train, supervise, and staff its medical personnel at Blair County Prison; and by fostering or permitting a culture of indifference to inmate medical needs that resulted in the approximately forty-hour delay in providing Mr. McClure with any meaningful medical care.

83. PrimeCare is further liable for the negligent acts and omissions of the Medical Defendants under the doctrine of *respondeat superior*. At all times relevant hereto, the Medical Defendants were employees, agents, or apparent agents of PrimeCare, acting within the course and scope of their employment or agency when they failed to provide timely and adequate medical care to Plaintiff.

84. The conduct of the Medical Defendants and PrimeCare as described herein was willful, wanton, and in reckless disregard of Plaintiff's rights, health, and safety. The approximately forty-hour delay in providing any meaningful medical evaluation or treatment to an inmate who presented with obvious signs of multiple facial fractures, including bilateral periorbital ecchymosis, conjunctival hemorrhage, decreased vision, diplopia, and severe pain, demonstrates a conscious disregard of a known and substantial risk of serious harm. Plaintiff is therefore entitled to an award of punitive damages pursuant to 40 P.S. § 1303.505(a), which provides that punitive damages may be awarded

for conduct that constitutes willful or wanton conduct or reckless indifference to the rights of others.

## DAMAGES

85.  As a direct and proximate result of the Defendants' actions and omissions as described herein, Plaintiff has suffered and continues to suffer the following injuries and damages:

   (a)  Serious physical injuries, including a right orbital blowout fracture with fat herniation and possible inferior rectus muscle entrapment; depressed nasal bone fractures (bilateral); bilateral periorbital ecchymosis; right conjunctival hemorrhage; contusion to the lower lip; possible left mandibular premolar fracture; and abdominal contusion;

   (b)  Severe and prolonged physical pain and suffering, including approximately forty (40) hours of untreated pain from multiple facial fractures;

   (c)  Blurred vision, diplopia (double vision), and decreased vision in the right eye, with the risk of permanent visual impairment;

   (d)  Past, present, and future medical expenses, including emergency room visits at two hospitals, diagnostic imaging (multiple CT scans, X-rays), laboratory evaluations, IV pain medication, specialist consultations, and any future surgical or rehabilitative treatment;

   (e)  Emotional distress, mental anguish, fear, anxiety, humiliation, and aggravation of pre-existing psychiatric conditions including post-traumatic stress disorder, anxiety disorder, and bipolar disorder;

   (f)  Loss of enjoyment of life; and

   (g)  Any and all other damages that may be proven at trial.

31

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Travis J. McClure respectfully requests that this Honorable Court enter judgment in his favor and against the Defendants, jointly and severally, and award the following relief:

(a)     Compensatory damages in an amount to be determined at trial, including damages for physical injury, pain and suffering, emotional distress, mental anguish, and medical expenses;

(b)     Punitive damages against the individual Defendants in an amount sufficient to punish and deter such conduct in the future;

(c)     Reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 1988;

(d)     Pre-judgment and post-judgment interest as allowed by law; and

(e)     Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

LEVIN & ZEIGER, LLP

March 26, 2026                    /s/ Laura Zipin
                                 LAURA ZIPIN, ESQUIRE
                                 Pa. ID No. 324914

                                 /s/ Brian J. Zeiger
                                 BRIAN J. ZEIGER, ESQUIRE
                                 Pa. ID No. 87063

                                 Levin & Zeiger, LLP
                                 Two Penn Center
                                 1500 JFK Blvd, Suite 620

32

Philadelphia, PA 19102
(215) 546-0340

33